IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SYMBOL TECHNOLOGIES, INC.,

    Plaintiff,

v.                                05-C-0256 C

INTERMEC TECHNOLOGIES CORP.,

    Defendant.

**DECLARATION OF
RAYMOND A. MARTINO IN OPPOSITION TO
INTERMEC TECHNOLOGIES CORPORATION'S MOTION TO TRANSFER**

1. I declare that I am over 18 years of age and I am competent to make this declaration based on my own personal knowledge. I make this declaration on behalf of the Plaintiff, Symbol Technologies, Inc. ("Symbol").

2. I am currently Vice President, Technical Strategy for Symbol. I have been employed by Symbol since 1987, and have been in my current position since March 2004. In my current position, I lead the technical strategy guiding Symbol's innovation and development with respect to the full range of Symbol's products, including bar code scanners, wireless local area networks ("WLANs"), RFID devices, mobile computers and mobility software.

3. I have a Bachelor of Science degree, as well as a Master of Science degree, both in electrical engineering, and I began my career at Symbol as a Senior Design Engineer, designing components for bar-code readers and WLANs. Prior to joining Symbol, I was a Design Engineer with Intel Corporation.

4. Prior to taking on my current position, and since 1992, I have had a number of management positions with respect to Symbol's WLAN business.

1

5. I understand from counsel that in the present case, Symbol is suing Intermec Technologies, Corp. ("Intermec") for infringement of United States Patent Nos. 5,243,655 ("'655 Patent") and 5,457,308 ("'308 Patent") (collectively, "Symbol's Wisconsin Patents"). Counsel has informed me that these patents relate to specific techniques for decoding bar-code symbologies, as evidenced by the titles of the patents: "System for Encoding and Decoding Data in Machine Readable Graphic Form" ('655 Patent); and "Bar Code Scan Stitching" ('308 Patent).

6. I also understand that Intermec has moved to transfer the present case to the District of Delaware, where Symbol has sued Intermec for infringement of four different patents, namely United States Patent Nos. 5,029,183 ("'183 Patent"), 5,479,441 ("'441 Patent"), 5,157,687 ("'687 Patent") and 6,473,449 ("'449 Patent") (collectively, "Symbol's Delaware Patents"). Counsel has informed me that these patents relate to specific techniques used in WLANs, and in particular, a power-saving mode of operation and a spread spectrum modulation technique. This is consistent with the titles of the patents: "Packet Data Communication Network" ('183 and '441 Patents); "Packet Data Communication System" ('687 Patent); and "High-Data-Rate Wireless Local-Area Network" ('449 Patent).

7. I understand that Intermec is arguing that even though the patents "claim[] many separate inventions involving several different technologies, there are sufficient technical similarities between this case and several of the patents in suit in Delaware to warrant transfer to avoid the necessity to educate two federal judges in basically the same technology."

8. I am very familiar with the areas of technology covered by each of the above patents, and contrary to Intermec's allegations, there is absolutely *no* technical similarity between them.

9. Bar-code decoding involves taking encoded data (a bar-code symbol), and decoding it into data that a user can understand. For example, PDF417 is one of the bar-code symbologies at issue in Symbol's Wisconsin Patents. A PDF417 symbol is shown below, which is encoded to contain the text "United States District Court for the Western District of Wisconsin." A bar-code reader must have special decoding software to decode this particular bar-code symbol (as opposed to other kinds of bar-code symbols, such as the familiar UPC bar-code found on grocery and other items).

 ⎯⎯⎯⎯⎯⎯▶ "United States District Court for the Western District of Wisconsin"

As one would expect, there is also a lot of emphasis in this field on not only creating a functional decoder, but also developing better techniques for decoding the symbols as efficiently as possible. That is the type of technology that is at issue in Symbol's Wisconsin Patents.

10. The WLAN technology of Symbol's Delaware Patents bears no relation to bar-code decoding technology. A WLAN, an example of which is illustrated in diagram below, is a collection of devices that communicate wirelessly using hardware and software that has nothing to do with bar-code decoding.



A Wireless LAN (WLAN) consists of access points connected to a wired network (or standalone) and devices with client adapters.

11. For example, three of Symbol's Delaware Patents relate to a power-saving mode of operation. Because devices in a WLAN can be portable, and because portable devices are powered by battery (rather than an unlimited power source, such as a wall outlet), conservation of power is an important issue for WLANs. Thus, techniques are developed that allow portable devices to communicate with other devices on the network, but at the same time, to be powered off as much as possible. These techniques have nothing to do with decoding bar-code symbols.

12. Indeed, two of the three power-saving patents were asserted successfully against Proxim Inc., and that company does not even make bar-code readers. I testified as a witness for Symbol in that action.

13. I understand that the fourth of Symbol's Delaware Patents relates to a different aspect of WLANs, namely spread spectrum modulation. This technology also bears absolutely no relation to bar-code decoding. Rather, spread spectrum modulation relates to techniques developed for sending data from point A to point B in a wireless network.

14. Despite the plain fact that the technologies at issue are so very different, I understand Intermec may also be arguing that because the different technologies are sometimes embodied in the same devices, the technologies are somehow "related."

15. It is true that both bar-code decoding and wireless technologies are sometimes embodied in a single bar-code reader (because a bar-code reader is sometimes part of a wireless network). That does not change the fact that the two technologies are wholly distinct, and there would be no overlap in any evidence regarding the workings of the two technologies.

16. Indeed, even though the technologies at issue are sometimes used in the same products, they are so technically distinct that Symbol develops them independently in different facilities, on opposite coasts of the United States. Symbol's wireless technology is primarily developed in Symbol's San Jose, California facility, while Symbol's bar-code decoding technology is primarily developed in Symbol's Holtsville, New York facility.

17. A useful analogy is a car, which can have both an engine and a radio. Obviously, an engine involves completely different technology than a radio. The fact that they are both sometimes found in a car is irrelevant, or at best only superficially relevant, to any tutorial on the two technologies. And, explaining what a car is, in the context of explaining the workings of an engine or a radio, is trivial. Likewise, explaining what a bar-code reader is to a judge or jury is at most a miniscule part of explaining, on the one hand, how that reader uses the technology of Symbol's Wisconsin Patents to decode bar-code symbologies, or on the other hand, how that reader uses the technology of Symbol's Delaware Patents to conserve power while part of a wireless network, or to communicate data wirelessly between point A and point B.

18. I also understand that Intermec may be arguing that Symbol's Delaware and Wisconsin Patents are somehow related because some of the patent claims refer to employing the various technologies in a bar-code reader.

19. In particular, I understand that Intermec is relying on the claim language of one of four of Symbol's Delaware Patents, and the claim language of one of six of Intermec's own patents that it is asserting as a counterclaim in that case. Looking at the language relied on by Intermec, it is clear that explaining the workings of a bar-code reader will not be an issue in the case.

20. With respect to Intermec's patent, United States Patent No. 5,892,971 ("'971 Patent"), I understand that Intermec has characterized the patent as covering "a portable battery-powered hand-held processing device incorporating 'an indicia reader input system' in combination with other elements." And, according to Intermec, an "indicia reader" includes a bar-code reader. However, to the extent the claim is actually construed to require a bar-code reader, that ends the technological inquiry. There is nothing to explain about how a bar-code reader actually works; any bar-code reader will meet that limitation. In fact, it is my understanding that if the claim is construed to require a bar-code reader, Symbol will not take the position that its bar-code readers do not meet that limitation. Of course, Symbol likely has a number of other non-infringement arguments, but explaining the intricacies of how a bar-code reader works will not be part of any of them. Moreover, by Intermec's own characterization, the "indicia reader" is merely one of a number of elements claimed in the '971 Patent, and the '971 Patent is merely only one of six patents, encompassing over a hundred claims.

21. The Symbol patent relied on by Intermec is the '687 Patent. I understand that Intermec points to the following claim language in particular: "a light source for directing light

toward a bar code symbol to be read and a light detector responsive to reflected light from a bar code symbol to generate an electrical signal containing bar code data." These are the basic components of *any conventional bar-code reader*. I cannot imagine any legitimate argument that this language recites any special bar-code reading features that Intermec's products would not have. Indeed, I understand that Intermec has not represented that it actually has any contemplated non-infringement positions based on this language.

22. Importantly, the universe of Intermec products that would be covered by Symbol's Delaware Patents is not the same as the universe of products that would be covered by Symbol's Wisconsin Patents. A cursory review of Intermec's website shows that many of Intermec's wireless-capable devices do not even have an integrated bar-code reader. Indeed, of the approximately 24 Intermec products that are accused in Symbol's Delaware Complaint, at least 17 of the products do not have an integrated bar-code reader.

23. Specifically, Intermec sells an entire series of wireless access points, marketed under the trade name MobileLAN™. True and correct copies of the "Product Profiles" for this line of access points are attached hereto as Exhibit A. An access point is essentially a wireless device that connects other wireless devices to each other in an infrastructure network, and also sometimes acts as a gateway to a wired network. There is no bar-code reading capability in an access point, which is further supported by the fact that Intermec's Product Profiles do not even mention bar-code reading.

24. Likewise, Intermec sells the 6650 and 6651 Pen Tablets. True and correct copies of Intermec's "Product Profiles" are attached hereto as Exhibit B. As Exhibit B shows, the 6650 and 6651 are basically conventional mobile computers with optional integrated wireless capability (802.11b). There is no mention of any bar-code reading capability. Although

7

someone could likely connect a bar-code reader to the devices, this is true for virtually any computer. Someone could also likely connect a printer to a computer, but that does not make the computer a printer.

25. Intermec also sells a line of vehicle-mounted computers with wireless capability. True and correct copies of Intermec's "Product Profiles" for its 2455, 2475 and 5055 vehicle-mounted computers are attached hereto as Exhibit C. There is no bar-code reading capability other than the fact that bar-code readers can be attached to the computers. As explained above, this is true for virtually any computer.

26. Similar to the vehicle-mounted computers, Intermec sells a line of stationary computers with wireless capability. A true and correct copy of Intermec's "Product Profile" for its 2480 stationary computers (including the 2485 and 2486) is attached hereto as Exhibit D. As with the vehicle-mounted computers, the only mention of bar-code reading capability is that bar-code readers can be attached to the computers.

27. Still further, Intermec sells a number of different printers with wireless capability but no bar-code reading capability. True and correct copies of the "Product Profiles" for the EasyCoder® 3400e, EasyCoder® 4420, EasyCoder® 4440, PB41 Direct Thermal Printer, and Intellitag PM4i are attached hereto as Exhibit E. These printers do *print* bar-codes, but they do not *read* bar-codes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 26, 2005.

Raymond A. Martino