0 5 -  5 2 8

Document Number Case Number
026                05-C-0256-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
07/13/2005 05:07:44 PM CDT

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SYMBOL TECHNOLOGIES, INC.,

        Plaintiff,           05 C 0256 C

v.

INTERMEC TECHNOLOGIES CORP.,

        Defendant.

---

### DECLARATION OF LELAND W. HUTCHINSON

---

LELAND W. HUTCHINSON, pursuant to 28 U.S.C. § 1746, declares as follows:

1.    I am a partner with Freeborn & Peters, L.P. ("F&P"), one of the counsel for defendant, Intermec Technologies Corporation ("Intermec"). I declare that I am over 18 years of age and I am competent to make this declaration based on my own personal knowledge.

2.    I make this declaration in support of Intermec's Rule 26(c), F.R.Civ.P., Motion for Protective Order and in opposition to Symbol Technologies, Inc.'s ("Symbol") Rule 37(a), F.R.Civ.P., Motion to Compel Discovery.

3.    This case is the fourth-filed litigation currently pending between Symbol and Intermec or their affiliates.

4.    The first such case is *Intermec IP Corp. v. Matrics, Inc.* C.A. No. 04-357 (D. Del.), filed June 7, 2004 (now called *Intermec IP Corp. v. Symbol Technologies, Inc.* because of Symbol's substitution). The discovery cut-off in that case is September 16, 2005. Document requests in that case are pending and documents are being produced by both sides to meet the cut-off.

5.  The second such case is *Symbol Technologies, Inc v. Intermec Technologies Corp.*, C.A. 05-146 (D.Del.), filed on March 10, 2005.

6.  The third such case is *Symbol Technologies, Inc v. Intermec Technologies Corp.*, C.A. 05-147 (D.Del.) (the "Symbol Delaware Patent Action"), filed on March 10, 2005.

7.  Intermec has moved pursuant to 28 U.S.C., § 1404(a) to transfer this case to Delaware for consolidation with the Symbol Delaware Patent Action because many of the Intermec products accused in this action are also accused in the Symbol Delaware Patent Action.

### SYMBOL'S ATTEMPTS TO OBTAIN DISCOVERY CONCERNING IMMUNE PRODUCTS

8.  In its complaint in this action, Symbol alleges that Intermec has infringed U.S. Patent No. 5,243,655 (to Wang) by making, using and selling "bar code readers capable of reading and decoding symbology known as PDF417." Compl., ¶ 9.

9.  In its complaint, Symbol alleges that Intermec has infringed U.S. Patent No. 5,457,308 (to Spitz) by making, using and selling "bar code readers capable of reading and decoding symbology known as Reduced Space Symbology ("RSS")." Compl., ¶ 15.

10. Symbol does not further identify any accused products in its complaint.

11. During the six years prior to Symbol's suit, the majority of Intermec's bar code reader products capable of scanning either PDF417 or RSS symbology have been manufactured with laser scan engines purchased from Symbol under the parties' OEM Agreement or a predecessor agreement.

12. A true and correct copy of the OEM Agreement is attached hereto as Exhibit A.

13. The OEM Agreement provides in pertinent part as follows:

> No right or license is granted by this Agreement … except for a limited immunity from suit for infringement of the claims of Symbol patents to the extent that they cover the OEM Products

OEM Agreement, ¶ 18.d.

2

14.    The OEM Agreement defines "OEM Products" to mean "Cabled Hand Held Bar Code Readers," "Cordless Hand Held Bar Code Readers," "Scanning Integrated Terminals" and "Wearable Scanning Systems." *Id.*, ¶ 1.c and Exhibit B.

15.    All of Intermec's accused products manufactured with Symbol scan engines fall into one of these categories and, thus, qualify as "OEM Products" within the meaning of the OEM Agreement.

16.    The OEM Agreement defines "Symbol patents" to include "all patent rights, worldwide, owned by Symbol during the term of this Agreement, or controlled by Symbol ..." *Id.*, ¶ 1.i.

17.    The two patents in suit in this case qualify as "Symbol patents" within the meaning of the OEM Agreement.

18.    As support of its Motion to Transfer Venue, Intermec argued that the immunity from suit provided by the OEM Agreement to all of Intermec's laser scan engine-based products using Symbol scan engines was a common issue between this action and the Symbol Delaware Patent Action where Symbol also accuses the same products.

19.    On June On June 7, 2005, Symbol filed with this Court the Declaration of Aaron B. Bernstein, which states in pertinent part:

> Symbol *agrees* with Intermec that Intermec products which use Symbol scan engines purchased from Symbol under the OEM Agreement are immune from infringement under the two patents asserted in this case.

Bernstein Declaration, ¶ 5 (Emphasis original).

20.    F&P's interviews with Intermec's employees, including Theresa Hillstrom, reveals that there are 45 Intermec bar code readers capable of scanning PDF417 or RSS symbology (thus making them accused products in this case) that have been manufactured and sold with Symbol scan engines (thus making them immune from suit under the OEM Agreement,

hereinafter the "Immune Products"). *See*, Declaration of Theresa Hillstrom at ¶ 3, which is attached hereto as Exhibit B.

21.     The Immune Products, and their predecessors, are clearly the majority of Intermec's bar code readers capable of scanning PDF417 or RSS sold during the last six years.

22.     Producing the discovery which Symbol requested concerning the Immune Products (before it admitted in the Bernstein Declaration that they were immune) would impose a huge and unnecessary burden on Intermec.

23.     Because the majority of Intermec's accused bar code readers are immune from suit as Symbol now readily admits, Intermec has been concerned that Symbol's discovery requests to it which cover Immune Products are overly burdensome and not calculated to lead to the discovery of admissible evidence.

24.     To that end, Intermec has attempted in good faith to resolve differences with Symbol concerning the Immune Products.

25.     On June 17, 2005, I wrote Symbol's counsel, Mr. Shane Bruner, pointing out that under Judge Shabaz' ruling in *Ty-Lan Enterprises, Inc. v. Menards, Inc.*, No. 04-C-084-S (March 9, 2004), Symbol was required to provide to Intermec as part of Symbol's initial disclosures under Rule 26(a)(1), F.R.Civ.P., Symbol's determinations as to which specific Intermec products Symbol had achieved a pre-filing belief that the products infringed either patent-in-suit. *See Antonious v. Spaulding & Evenflo Companies, Inc.*, 275 F.3d 1066 (Fed.Cir. 2002). *See* Brocchini Decl., Exhibit 3.

26.     I wrote to Mr. Bruner in a good faith attempt to curtail discovery as to the Intermec products which Symbol has now admitted are Immune Products and are thus not at issue in this case.

4

27.    Symbol's response was a June 21, 2005, letter to me from Mr. Lawrence Brocchini refusing to further identify which specific Intermec products Symbol was actually accusing of infringement in this case. Mr. Brocchini's position was that, because this case is pending before Judge Crabb, Judge Shabaz' ruling in *Ty-Lan* is inapplicable. *See* Brocchini Decl., Exhibit 7.

28.    Because of its concerns about needlessly producing discovery about Immune Products, Intermec timely imposed on June 20, 2005, objections to many Symbol discovery requests to preserve Intermec's right to seek either a stipulation or, failing that, a protective order appropriately limiting discovery concerning the Immune Products.

29.    Intermec also objected that Symbol had not adequately specified in its discovery requests what it means by "Reduced Space Symbology" or "RSS."

30.    In his July 27, 2005, letter to me, Mr. Brocchini termed Intermec's RSS objections "frivolous," claiming that "RSS is a well-known bar code symbology ... recognized by the Association of Automatic Identification and Mobility ("AIM")." *See* Brocchini Decl., Exhibit 8, at 3.

31.    Attached hereto as Exhibit C is a true and correct copy of an AIM publication concerning "Standards: Reduced Space Symbology (RSS)."

32.    As stated therein, "[t]he EAN.UCC Reduced Space Symbology (RSS) family contains three linear symbologies ..."

33.    It is not apparent which of these symbologies Symbol contends is covered by the patents-in-suit.

34.    It is, thus, appropriate for Symbol to specify which form of RSS it contends infringes and to limit its own discovery accordingly.

5

35.    To preserve these issues, Intermec interposed timely objections to Symbol's RSS discovery requests. These objections are not frivolous.

36.    On June 30, 2005, I spoke by telephone with Mr. Brocchini in an attempt to meet and confer about the stipulation concerning the Immune Products and Intermec's objections to Symbol's discovery requests.

37.    During that conference, Mr. Brocchini assured me that Symbol was willing to discuss a stipulation concerning the Immune Products and that Symbol did not seek to obtain improperly broad discovery related to the Immune Products.

38.    During that conference, Mr. Brocchini suggested to me that we should negotiate such a stipulation in detail based upon a proposed form of stipulation that Intermec would provide to Symbol.

39.    During our conference, no specific time was established for Intermec to propose the form of the stipulation.

40.    During our conference, I offered to withdraw certain of Intermec's objections to Symbol's discovery requests on the understanding that Symbol would proceed in good faith to stipulate to limit discovery about the Immune Products.

41.    Without that stipulation (or a protective order, as Symbol appears no longer willing to confer on a stipulation), Intermec's various objections remain valid and are not withdrawn.

42.    During our conference, I told Mr. Brocchini that F&P had been working diligently for months to gather and review documents responsive to Symbol's discovery requests in the various pending cases.

6

43.    During our conference, I told Mr. Brocchini that Intermec's counsel believed that it had gathered all responsive information from Intermec's domestic offices and locations, but that F&P had not yet had an opportunity to gather similar information from Intermec's international offices.

44.    During our conference, I told Mr. Brocchini that, because Intermec's decoder software was developed at its division in Toulouse, France, F&P had not yet been able to gather some key information responsive to Symbol's discovery requests in this case.

45.    There are approximately 14 Intermec employees located in Toulouse who F&P must interview and whose files F&P must review as part of the discovery process in all cases. Many of these employees appear to have relevant information to this case.

46.    Although F&P did schedule a trip to accomplish this review in June, 2005, that trip had to be cancelled because too many of the key people were not then available.

47.    During our conference, I told Mr. Brocchini that the F&P discovery team had not yet had the opportunity to travel to Toulouse, France to interview the Intermec employees residing there because too few of the key employees had been in the office at the same time.

48.    During our conference, I told Mr. Brocchini that a team of F&P lawyers and paralegals will be traveling to Toulouse between July 9 and 14, 2005, to conduct the required interviews and document review.

49.    During our conference, I told Mr. Brocchini that Intermec would start producing documents on a rolling basis this week, as review of the documents was completed.

50.    Statements in Mr. Brocchini's July 1, 2005 letter to me and in his declaration filed in support of Symbol's Motion to Compel to the effect that I refused to commit to any date when Intermec's document production in this case would start are incorrect.

7

51.    In fact, on July 8, 2005, Intermec produced over 1800 pages of documents (gathered from its domestic facilities) responsive to the discovery requests in this case.

52.    During our conference, I told Mr. Brocchini that Intermec would supplement its interrogatory answers upon the return of the F&P team from France.

53.    When Mr. Brocchini wrote me on July 1, 2005, demanding a response later that day, we had not yet completed the identification of Intermec's Immune Products set forth in paragraph 20 of this declaration. As a result, I was not yet ready to propose a detailed Immune Products stipulation to him.

54.    By July 7, I had prepared and was circulating for comment a responsive letter to Mr. Brocchini which included a proposed stipulation about the Immune Products.

55.    I stopped working on the responsive letter only when I was served by e-mail with Symbol's Motion to Compel.

56.    During our conference, Mr. Brocchini did not articulate to me any prejudice that he contends Symbol would suffer in this or any other action if document production in this case begin on July 8, 2005 and continued on a rolling basis until complete.

57.    During our conference, Mr. Brocchini did not articulate to me any prejudice that he contends Symbol would suffer in this or any other action if Intermec supplemented its interrogatory answers in mid-July, 2005.

### INTERMEC'S DISCOVERY DILIGENCE

58.    F&P is responsible for collecting, reviewing and producing documents and information responsive to Symbol's various discovery requests in all of the actions between Intermec or its affiliates and Symbol except the newly filed International Trade Commission action (the "ITC Action").

8

59.    Since April 12, 2005 (weeks before this case was filed on April 28), teams of F&P lawyers and paralegals have been traveling to Intermec facilities at various locations throughout the United States to interview Intermec employees to determine whether they have documents or information responsive to discovery request in the various cases.

60.    To date, the F&P discovery team has made approximately 10 trips to various domestic Intermec facilities.

61.    To date, the F&P discovery team has interviewed over 100 Intermec employees about responsive information and documents.

62.    It has been most efficient to gather responsive information for all cases related to certain classes of accused products or certain issues in the same employee interview or file search.

63.    Thus, F&P has gathered potentially responsive information on a product-by-product or issue-by-issue basis rather than treating each case separately.

64.    Treating each case separately for purposes of locating potentially responsive information would result in much needless duplication of interviews and file reviews and serious delay to the overall discovery process.

65.    Because all of the products accused in this case are also accused in the Symbol Delaware Patent Action, F&P has gathered potentially responsive information pertaining to both actions at the same time.

66.    To date, the F&P discovery team has located over 2 million pages of paper and electronic documents potentially responsive to Symbol's various discovery requests in all pending cases.

9

67.    When potentially responsive documents are located, F&P has caused them to be sent to vendors who have imaged the documents.

68.    When F&P receives the document image files from the vendor, they are loaded into a database.

69.    After the images are loaded, the F&P document review team reviews each document for responsiveness, privilege and confidentiality.

70.    At present, F&P has a total of 25 lawyers involved in the document review and production process.

71.    Of these, nine lawyers have been assigned to review and produce documents in this case and the Symbol Delaware Patent Action.

72.    Once reviewed, responsive, non-privileged documents are then produced to Symbol on a rolling basis in electronic form ready to be loaded into Symbol's document database.

73.    This production process appears to be the most efficient manner of handling discovery compliance in these large volume document cases.

74.    To date, rolling document production as been perfectly acceptable to Symbol for document production in other cases.

75.    This is the only case in which Symbol has now insisted on all relevant documents being produced immediately.

76.    To date, Intermec has produced over 105,500 pages of documents to Symbol in all cases. As stated above, production in this case to Symbol began on July 8, 2005. Production continues on a rolling basis.

10

77.    At present, F&P believes that it has located all information responsive to Symbol's various discovery requests from all of Intermec's domestic locations.

78.    F&P, however, has not yet had the opportunity to search for responsive information at Intermec's various international locations.

79.    That process will begin next week with F&P's visit to Intermec's Toulouse, France, location.

80.    The Toulouse, France, location has been selected for the first international visit because it is the location most likely to have documents responsive to Symbol's discovery requests in this case.

81.    During our conference, Mr. Brocchini attempted to set a date by which all document production in this case would be complete.

82.    Although F&P is diligently searching the most likely locations for responsive information, we will be unable to honestly certify that all responsive information has been found until all of Intermec's international locations have been queried and/or visited.

83.    In connection with Intermec's document production, F&P has also had to locate and collect various Non-Disclosure Agreements between Intermec and third parties. These agreements each require notice if information obtained from the third party is to be produced.

84.    To date, F&P has provided individualized notice to over 1,600 third parties under various Non-Disclosure Agreements between such parties and Intermec and fielded calls from many such parties.

### THE ITC ACTION HAS NOT DELAYED DISCOVERY

85.    In support of its Motion to Compel, Symbol argues that Intermec necessarily diverted resources from discovery compliance to prepare and file its recent International Trade Commission action (the "ITC Action") against Symbol. That claim, however, is simply not true.

11

86.     Intermec retained Morrison & Foerster's ("M&F") New York office to provide lawyers with specialized ITC experience to prepare and file the ITC Action.

87.     One reason for retaining M&F was to prevent the resources of Intermec's other counsel from being diverted from the other cases.

88.     M&F's work on the ITC Action has in no way delayed F&P's discovery compliance efforts on behalf of Intermec in this or any other case.

I declare under penalties of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 8, 2005.

Leland W. Hutchinson

12

## SYMBOL TECHNOLOGIES, INC.

### OEM AGREEMENT

Attachments:

| | |
|---|---|
| EXHIBIT 1 | TERM AND INITIAL PURCHASE COMMITMENT |
| EXHIBIT 2 | OEM PRODUCT SPECIFICATION |
| EXHIBIT 3 | PRODUCT AND PRICE SCHEDULE |
| EXHIBIT 4 | PRODUCT AND PRICE SCHEDULE |
| EXHIBIT 5 | PRODUCT AND PRICE SCHEDULE |
| EXHIBIT 6 | FIELD OF USE |

**COMPANY NAME:**       Intermec Technologies Corporation

**ADDRESS:**       6001 36th Avenue, West

**CITY, STATE, ZIPCODE:**       Everett, WA 98203-1264

**PHONE NO:**       425-348-2636

**FAX NO:**       425-348-2703

Symbol Technologies, Inc.
One Symbol Plaza
Holtsville, NY 11742-1300
August 28, 2003                                      OEM Agreement:

Confidential – Pursuant to Local Rule 26.2
Intermec IP Corp. v. Matrics, Inc., C.A. No. 04-357-GMS





## SYMBOL TECHNOLOGIES, INC.
## OEM AGREEMENT

THIS AGREEMENT, effective as of  January 1, 2004 by and between Symbol Technologies, Inc., a

Delaware corporation, having it principal place of business at One Symbol Plaza, Holtsville, NY 11742-

1300 (hereinafter "Symbol"), and Intermec Technologies Corporation, a  Washington corporation,

(hereinafter "Buyer") having its principal place of business at:

6001 36ᵗʰ Avenue, West
_____
                          (Street Address)
Everett, WA 98203-1264
_____
                          (City, State Zip)

The parties agree as follow:

**1.**    **Definitions**

**a.**    "Product(s)" shall mean any of Symbol's products listed in Exhibits 3, 4 and 5 and available for sale during the term hereof and any new products added from time to time by mutual consent of the parties.

**b.**    "OEM" shall mean a company which is engaged in the design, development, manufacture and selling or leasing of electronic or information processing hardware products into which are incorporated products purchased directly or indirectly, from another manufacturer, where: (i) such product of another manufacturer is utilized as a constituent component or subassembly of such hardware products; and (ii) such hardware products provide functionality beyond that of the product purchased from the other manufacturer; and (iii) the product purchased from the other manufacturer becomes a subassembly or component in the final hardware product and the identity of the product purchased from the other manufacturer is usually not apparent in the final hardware product.

**c.**    "OEM Product(s)" shall mean any product designed, in all material respects, by Buyer and which is described and set forth in Exhibit  2 (OEM Product Specification), manufactured by or for Buyer (if for Buyer, for sale only back to Buyer, and then for sale by Buyer through its traditional channels and direct sales and not on behalf of a third party), into which product is incorporated Product purchased from Symbol.

**d.**    "Territory" shall mean all countries.

**e.**    "Field of Use" shall mean only those fields of use described in Exhibit 6.

**f.**    Party shall mean either Symbol or Buyer. Parties shall mean Symbol and Buyer collectively.

**g.**    Initial Term shall mean the period of time set forth in Exhibit 1.

**h.**    Initial Minimum Purchase Commitment shall mean the minimum purchase requirement, as set forth in Exhibit 1.

**i.**    Symbol Patent Rights shall mean all patent rights, worldwide, owned by Symbol during the term of this Agreement, or controlled by Symbol during the term of this agreement without obligation by Symbol to pay compensation for the use of such rights.

**2.**    **Scope of Agreement**

**a.**    This Agreement shall govern the procurement by Buyer from Symbol of any Products available for sale during the term hereof.

**b.**    The Products purchased by Buyer hereunder, are to be used only to manufacture the OEM Product for sale only within the Field of Use and only into the Territory; Symbol covenants not to assert any claim of infringement of Symbol Patent Rights against the OEM Product. The OEM is not authorized to market or

Symbol Technologies OEM Agreement
Printed: 08/28/03 10:10 AM

Initialed _RK_ (Symbol) _RDP_ (Buyer)

Page 2

Confidential – Pursuant to Local Rule 26.2
Intermec IP Corp. v. Matrics, Inc., C.A. No. 04-357-GMS

resell the Product separate from the OEM Product under any circumstances. OEM acknowledges that Symbol has Symbol Patent Rights covering the Products and the OEM Products and their use and the purchase of the Product hereunder does not imply any license under Symbol Patent Rights.

### 3.    OEM and Product Use Certification

**a.    OEM Certification.** Buyer certifies that it is an OEM, and Buyer agrees and warrants that the Products ordered hereunder will solely be used by Buyer in the assembly, and as a constituent part of the OEM Products, for resale or lease to others solely in the Field of Use and solely within the Territory. Additionally, Buyer may sell Products to Buyer's end user customers, authorized resellers, contract manufacturers and authorized service providers (Authorized Service Contractors) for the purpose of repairing and maintaining OEM Products sold by Buyer in accordance with the terms of this Agreement, provided nothing herein shall constitute a right to sell or distribute Products to any third party for use in any OEM Products other than Buyer's OEM Products sold in accordance herewith. Buyer shall use its best efforts to contractually obligate such Authorized Service Contractors to maintain records and data to permit Symbol to confirm that Products supplied hereunder are used in accordance with the terms of this Article and permit Symbol to audit such usage.

**b.    Product Use Verification.** In connection with Buyer's purchase of the Products hereunder, the records and accounts of Buyer (as well as those of any *Authorized Service Contractors*) shall be available for inspection by independent representatives of Symbol during usual business hours for the purpose of verifying whether the Products purchased by Buyer are utilized solely as stated in the certification set forth in Section 3a above, provided, however, that such independent representatives of Symbol shall not transmit to Symbol any confidential information, including without limitation, customer identities, in connection with such inspections. Such independent representative's report shall be limited to a positive or negative statement of finding with respect to violation/compliance, *provided* that in the event of a negative compliance, Symbol shall be entitled to such information as *may be reasonably required* to evaluate the scope of non-compliance and merits

of any non-compliance defenses. The Information may also be used in any tribunal in the event of a dispute as to Buyer's compliance with the terms of this Agreement. Such verification audits shall be accomplished no more frequently than annually (unless non-compliance is found by the independent auditors) and shall be *noticed and commenced no later than twelve* (12) months of the end of this Agreement.

### 4.    Purchase of Symbol Products

**a.    Purchase Orders.** Symbol agrees to sell the Products to Buyer or Buyers designated subcontract manufacturers, and Buyer or Buyers designated subcontract manufacturers agrees to purchase from Symbol and accept delivery of such Products in accordance with purchase order releases issued by Buyer or Buyers designated subcontract manufacturers citing this agreement for terms and conditions and subject to acceptance by Symbol. A copy of Symbol's pricing schedule and current list of the Products is attached hereto as Exhibits 3, 4 and 5. Purchases from Buyers designated subcontract manufacturers shall be deemed purchases made under this agreement for all purposes of this agreement. Buyer's designated subcontract manufacturers shall maintain adequate records to establish that any Products purchased hereunder shall be used solely for Buyer's OEM Product manufacturing and shall be subject to all the terms and conditions set forth herein, and Buyer shall guarantee payment of all purchases made by Buyer's designated subcontractors hereunder. Symbol shall have no obligation to supply a subcontracting manufacturer of Buyer which is breach of any other agreement with Symbol.

**b.    Other Forms.** During the term of this Agreement, all arrangements between Buyer and Symbol for the sale of Products by Symbol to Buyer shall include, and be governed exclusively by, the terms and conditions set forth in this Agreement and Exhibits hereto. The terms and conditions on release or purchase order or other forms issued by Buyer whether consistent with, inconsistent with, contrary to, or in addition to the terms of this Agreement shall be deemed deleted and shall not modify or supplement this Agreement in anyway; notwithstanding the fact that Symbol may acknowledge or otherwise approve such purchase orders. In case of any conflict between this Agreement and any other documents, including, but not limited to,

Symbol Technologies OEM Agreement
Printed: 08/28/03 10:10 AM

Initialed _C.K_ (Symbol)   _RDP_ (Buyer)

Page 3

Confidential – Pursuant to Local Rule 26.2
Intermec IP Corp. v. Matrics, Inc., C.A. No. 04-357-GMS

acceptances, correspondence, memoranda or other documents for, or relating to, the Product purchased by Buyer from Symbol during the term of this Agreement, which are not executed in accordance with Article 19a, this Agreement shall govern and prevail.

c.     Minimum  Purchase Commitment.  By executing this Agreement, Buyer hereby agrees with Symbol to purchase at least sufficient quantity of Products to satisfy the Minimum Purchase Commitment of Exhibit 1.

d.     IP Value.  The parties acknowledge that the Product pricing under this Agreement takes into account among other things the value of Symbol intellectual property embedded in the Product(s).

5.     Forecasts and Rolling Orders

a.     Reports  and  Forecasts.  Exhibit 1 includes a twelve (12) month release forecast for Product. The quantities forecast during the first two month time period shall be considered a firm release  commitment  ("Frozen  Release Commitment"). It is understood by Symbol that the remaining ten-month quantities are estimated release quantities and are not to be considered as firm release commitments by Buyer. On or before fifteen (15) days into each calendar month, Buyer shall send a new twelve (12) month release forecast to Symbol. The quantity of Product shown in the second calendar month of this new release forecast shall become a firm release commitment and part of the Frozen Release Commitment. The forecasting process described above shall continue on a monthly basis during the term of this Agreement. Buyer may change, without penalty, any of the forecast months' release quantities that are not part of the Frozen Release Commitment.   Symbol shall deliver the quantities of Product ordered on the dates specified in each order with a standard thirty-seven (37) calendar day lead-time, up to the quantity which has been forecast for sixty (60) calendar days before the requested delivery date. Symbol shall deliver up to a 50% increase above forecast quantities with a lead-time of thirty-eight (38) to sixty (60) calendar days. Symbol shall deliver up to 100% increase above forecast quantities with a lead-time of sixty-one (61) to ninety (90) calendar days.

b.     Rolling Orders.  Each month of this Agreement Buyer shall issue a purchase order release for the third forthcoming month's quantity of Product so that the purchase order releases shall cover the entire period of the Frozen Release Commitment.

c.     Acknowledgments.  Symbol shall acknowledge the purchase order releases, quantity and ship dates within seven (7) business days after receipt of the purchase order release. Absence of an acknowledgment will be deemed an acceptance.

d.     Delivery Dates.  Each purchase order release from Buyer shall specify the desired dates for shipment of Product and the quantities and model mixes of Product to be delivered on such dates. Buyer may not reschedule the shipment date on an order within 30 days of the scheduled shipment unless mutually agreed to by the parties.

e.     Liquidated Damages.  In the event that Buyer fails to purchase and accept sufficient quantity of Product to meet the Minimum Purchase Requirements set forth in Exhibit 1, Buyer shall pay Symbol, as fixed and agreed upon liquidated damages, in lieu of all other damages for such failure to which Symbol may be entitled, cash in the amount equal to fifty percent (50%) of the Minimum Purchase Commitment Shortfall Amount (as defined is Exhibit 1), which amount shall be paid within thirty (30) days of the end of the Applicable Time Period. The Parties agree that Symbol's damages are not readily determinable and that the amount of liquidated damages set forth above is a negotiated reasonable estimate of Symbol's damage and is to be used in the event of Buyer's non-performance as stated above. The foregoing liquidated damages provisions shall not apply in the event Buyer has failed to meet the Minimum Purchase Commitment for the Applicable Time Period and Buyer purchases from Symbol at least 75% of all of its requirements (including those manufactured by or for Buyer) for bar code reading engines, devices or other form of bar code reading elements (including CCD engines, but excluding non-laser contact and near contact devices having a working range not extending beyond .25 inches from the target).

Confidential – Pursuant to Local Rule 26.2
Intermec IP Corp. v. Matrics, Inc., C.A. No. 04-357-GMS

6.   **Confidentiality**

a.   **Scope.** The Parties have developed certain confidential and proprietary information ("Confidential Information") including, but not limited to: patentable inventions, trade secrets, new products, copyrights, computer software, documentation and specifications, flow charts, source and object code, system configurations, schedules, costs, performance features, specifications, techniques, copyrighted matter, plans, methods, drawings, data, tables, calculation, documents or other paperwork, financial statements, financing documents, business and marketing plans, dealings, arrangements, objectives, location, and customer information. Any written proprietary information exchanged by the parties and entitle to protection hereunder shall be identified by an appropriate stamp or marking on each document exchanged. If oral, visual, electronic or other non-written disclosures of proprietary information are made, such information shall be entitled to protection only if a written notice with a complete summary of all such disclosures, appropriately stamped or marked, is delivered to the receiving party addressed as noted hereafter in this Agreement within thirty (30) working days of such disclosure.

b.   **Disclosure.** In order to pursue a business relationship, the parties recognize the need for disclosure of certain of their Confidential Information to one another. The Parties are willing to disclose such Confidential Information pursuant to the terms and subject to the following conditions:

Each Party acknowledges that all Confidential Information which has, or will, come into its possession or knowledge in connection with business discussions, communications, conferences or other activities between Symbol and Buyer (i) is proprietary, having been designed or developed by each Party at a great expense and over lengthy periods of time, and (ii) is secret, confidential and the exclusive property of the disclosing Party. Each Party further acknowledges that any use or disclosure of Confidential Information other than for the sole benefit of the receiving Party will be wrongful and will cause irreparable injury to the disclosing Party and, therefore, each Party agrees to hold Confidential Information in strictest confidence and not to make use of it other than

for the benefit of the other Party, unless and until such information becomes public knowledge without direct or indirect breach of a duty of confidentiality to the disclosing Party and without fault of the receiving Party. Confidential Information does not include information, if, on the effective date hereof, such data is or later becomes: (i) developed by the receiving party independently of the disclosing party; (ii) rightfully obtained without restriction by the receiving party from a third party who is lawfully in possession of the information, who has a right to make such disclosure and who is under no duty to maintain the information in confidence; (iii) publicly available other than through the fault of the receiving party; (iv) released without restriction by the disclosing party to anyone; or (v) known to the receiving party at the time of its disclosure.

c.   **Best Efforts.** Neither Party shall communicate any Confidential Information in any form to any third party without the prior written consent of the disclosing Party and shall use its best efforts to prevent inadvertent disclosure of Confidential Information to any third party.

d.   **Employee and Others.** The Parties acknowledges that in order to enable them to pursue a business relationship, the Parties may need to disseminate Confidential Information to various of their employees or authorized third parties. The Parties agree to cause any such employee or party to whom Confidential Information is transmitted to be bound to the same obligation of secrecy and confidentiality that they are bound to. The duty of confidentiality shall survive the cancellation, expiration or termination of this Agreement for a period of five (5) years. Within fifteen (15) days of the expiration or termination of this Agreement, each party shall return all Confidential Information.

7.   **Product Specifications**

a.   **Product Change Notice.** Symbol shall not make any modifications, improvements, alterations or changes (hereinafter collectively referred to as "Changes") to the Products listed in the attached Exhibits 3, 4 and 5 during the term of this Agreement that affect the form, fit, function, or that reduce reliability, or that affect interchangeability of the changed or modified

Confidential – Pursuant to Local Rule 26.2
Intermec IP Corp. v. Matrics, Inc., C.A. No. 04-357-GMS

Product unless Intermec is provided with at least 180 days prior written notice of such Changes, provided that any such Changes may be treated by Buyer as an End Of Life Notice in the event it materially impacts any OEM Products. The End Of Life provisions relating to last buy opportunities set forth below shall apply at such time.

b.      End of Life Notice: Symbol shall give Buyer nine (9) months written notification in advance of any Product end of life (EOL). After receipt of such notice Intermec shall have the opportunity to make and SYMBOL shall be obligated to produce a last time buy. The quantities to be produced shall be based on usage, forecasts, service requirements, and potential product migrations.

8.      Infringement Indemnification

a.      Indemnification. Symbol shall defend any claim, suit or proceeding brought against Buyer in so far as it is based on a claim that the use or transfer of any Product delivered hereunder constitutes an infringement of a United States patent or copyright in existence as of the date of delivery of the product to Buyer, (an "Infringement Claim") so long as Symbol is notified promptly in writing by Buyer as to any such action and is given full authority, information and assistance (at Symbol's expense) for the defense. In addition to Symbol's obligation to defend, Symbol shall pay all damages and costs (except consequential damages) awarded therein against Buyer. The obligations for defending and indemnifying Buyer set forth in the preceding two sentences shall not, however, extend to products delivered hereunder which would give rise to a claim against Symbol solely for contributing infringement or inducement of infringement. Symbol shall not be responsible for any compromise made without its consent. Notwithstanding the foregoing, in the event of an Infringement Claim, Symbol's obligation under this paragraph 8 shall be fulfilled, at Symbol's sole option and expense, if Symbol at any time: (i) obtains a license for Buyer, to continue the use or to sell the infringing product purchased from Symbol, or (ii) refunds the purchase price paid to Symbol by Buyer for such infringing product less a reasonable amount for use, damage, or obsolescence, and removes such product, or (iii) replaces or modifies the in-

fringing product so as to be substantially functionally equivalent to the infringing product but non-infringing. Buyer agrees that the foregoing indemnification shall not apply and moreover, shall be extended to Symbol for any claim of U.S. patent infringement which may be brought against Symbol because of compliance with Buyer's particular design requirements, specifications or instructions. Buyer grants to Symbol the benefit of any license to Buyer applicable to Product sold to Buyer under any patent which may be the subject of an infringement allegation hereunder, to the extent permitted by said license.

b.      Limitation of Liability. Symbol shall have no liability to Buyer under this paragraph 8 if any Infringement Claim is based upon the (i) use of products delivered hereunder in connection or in combination with equipment, devices or software not delivered by Symbol, or (ii) use of products delivered hereunder in a manner for which the same were not designed, or (iii) modification by Buyer of products delivered hereunder to the extent such modification is the cause of the claim or suit. EXCEPT AS STATED ABOVE, SELLER DISCLAIMS ALL WARRANTIES AND INDEMNITIES, EXPRESS, IMPLIED, OR STATUTORY, FOR PATENT OR COPYRIGHT INFRINGEMENT.

9.      Termination

a.      Cancellation upon Insolvency. Either party may cancel this Agreement upon written notice to the other party without any further liability hereunder for any of the following reasons:

(i) Should the other party hereto become insolvent or make assignment for the benefit of its creditors; or

(ii) Should a petition in bankruptcy or for arrangement, composition or reorganization be filed by or against the other party or should a receiver or trustee of any of the property of such other party be appointed, and the same is not discharged within thirty (30) days following written notice from the non-defaulting party.

b.      Termination. In the event of a material breach of any of the terms and conditions of this Agreement by one of the Parties hereto, the non-defaulting Party may terminate this Agreement

Confidential – Pursuant to Local Rule 26.2
Intermec IP Corp. v. Matrics, Inc., C.A. No. 04-357-GMS

(and any Frozen Release Commitment), without limitation of any other right it may have on account of such failure, upon written notice to the Party in default ("Defaulting Party"), provided that the Defaulting Party fails to cure such material breach within thirty (30) days after written notice from the non-defaulting Party describing the breach and requesting the Defaulting Party to cure.

c.  Patent Assertion.  If either Party asserts a bona fide claim of patent infringement outside the *scope of the covenant of Section 18.k* against the other Party, then such other party may in addition to any other rights and remedies it may have at law or in equity terminate this Agreement upon thirty (30) days prior written notice .

d.  Rights  and  Obligations  after Termination.  Except as expressly provided herein, the expiration or termination of this Agreement shall not affect or impair the rights, liabilities and obligations of either party to the other under any Frozen Release Commitment for Product existing prior to such expiration or termination, nor relieve either party of any obligation or liability accrued under this Agreement or pursuant to any firm order prior to such expiration or termination.

e.  Payment Obligations after Termination. Buyer *shall pay all moneys owed Symbol at the* time of the expiration, cancellation or termination of this Agreement, regardless of the payment terms of such moneys that may have otherwise been granted prior to the effective date of such expiration, cancellation or termination, upon the earlier of:
(i)  thirty (30) days following the effective date of such expiration, cancellation or termination of this Agreement; or
(ii)  pursuant to the applicable terms of payment for the invoice.

f.  Delivery Rescheduled:  To the extent Symbol fails to deliver Products ordered in accordance with the terms of this Agreement, and such failure to deliver causes Buyer to fall short of its Initial Purchase requirements set forth in Exhibit 1, Buyer's Initial Purchase Obligation shall be reduced by the amount of Products which Buyer orders and Symbol failed to deliver in accordance herewith.

g.  Breach or Default by Symbol.  In addition to its rights and after the cure notice provided under Section  9 b above, Buyer reserves the right to terminate this Agreement in the event Symbol fails to deliver material quantities of the Products per specification within thirty (30) calendar days of the agreed to delivery schedule, provided Symbol may cure such breach by delivering Products within 3 business days of receiving notice of a default under this provision..  The foregoing shall not apply in the event of a good faith dispute between the parties regarding a material breach of this Agreement, or in the event a failure to deliver is due to Buyer's non-payment of monies due hereunder.

10.  **Effective Date, Term and Survival**

a.  **Effective Date.**  This Agreement shall be become effective on January 1, 2004 (the "Effective Date").

b.  **Term of Agreement.**  The Agreement shall be in effect for the Initial Term, as defined in Exhibit 1 and for Renewal Terms, unless either party has provided at least six months prior written notice of its intent not to renew this Agreement for the upcoming Renewal Term.

11.  **Terms of Payment**

a.  **Payment.**  All terms are thirty (30) days net from date of shipment, subject to the approval by Symbol of the amount and terms of credit. Symbol reserves the right at any time to revoke any credit extended to Buyer if payment is in arrears for more than thirty (30) days after notice to Buyer or Buyer's credit does not warrant further extension of credit.  Each shipment shall be invoiced and paid for when due without regard to other scheduled deliveries.

12.  **Title and Delivery.**

a.  **Title.**  Symbol shall ship Products purchased under this Agreement, FOB ship point, so as to be received, allowing for normal transit times, in accordance with the schedule specified on the purchase order.  Title, risk of loss and damage shall pass from Symbol to Buyer upon delivery to common carrier or Buyer's representative at the F.O.B. point, Symbol's factory at Bohemia, New York or its plant of *manufacture*. Buyer *shall have the responsibility* to pay for insurance. All claims for damage must

Confidential – Pursuant to Local Rule 26.2
Intermec IP Corp. v. Matrics, Inc., C.A. No. 04-357-GMS

be filed by Buyer directly with carrier. If Symbol delivers the Products more than ten (10) business days in advance of the agreed to delivery date, Buyer will retain such Products and postpone payment until it is due. Partial shipments will be authorized, but will not relieve Symbol from fulfilling its total obligations on all existing purchase orders. The mode of shipment shall be by surface collect unless otherwise specified on the purchase order or verbally by an authorized agent of Buyer. The carrier will be as specified by Buyer.

b.     Delivery.  In the absence of specific instructions, Symbol will select the carrier for shipment, but by doing so, will not thereby assume any liability in connection with shipment, nor shall the carrier in any way be construed to be the agent of Symbol.

c.     Liability.  Symbol shall not be liable for any damages or penalty for delay caused solely by transportation or failure to give notice of such delay.

13.    Taxes.

a.     Taxes.  Prices under this Agreement for Product are exclusive of duties and all federal, state, municipal or other government excise, sales, use, occupational or like taxes now in force and any such taxes shall be assumed and paid for by the purchasing party. If a Certificate of Exemption or similar document is required in order to exempt the sale from sales or use tax liability, Buyer will supply such a certificate or document to Symbol.

14.    Software.

a.     Software License.  All software (including firmware) furnished to Buyer is on a licensed basis. Symbol grants to Buyer a non-transferable and non-exclusive license to use each software or firmware program delivered hereunder (Licensed Program). Each such license granted authorizes Buyer to use the Licensed Program in any machine-readable form only. Such license may not be assigned, sub-licensed or otherwise transferred by Buyer without prior written consent of Symbol except that, regarding any Licensed Program embodied in a Product, the transfer of such Product shall convey to Buyer's transferee and to subsequent transferees a license to use such Licensed Program under

terms commensurate with the License set forth in this Agreement. No right to copy a Licensed Program in whole or in part is granted except as permitted under the Copyright Law. The Buyer shall not modify, merge, or incorporate any form or portion of a Licensed Program with other program material, create a derivative work from a Licensed Program, or use a Licensed Program in a network. Buyer agrees to maintain Symbol's copyright notice on the Licensed Programs delivered hereunder, and to include the same on any authorized copies it makes, in whole or in part. Buyer agrees not to decompile, decode, or reverse engineer any Licensed Program delivered to Buyer or any portion thereof.

15.    Limited Warranty.

a.     Warranty.  (i) The laser based scan engine Products covered by this Agreement are warranted against defects in workmanship and materials for a period of thirty-six (36) months from the date of shipment, provided the Product remains unmodified and is operated under normal and proper conditions; (ii) the imaging sensor based scan engine Products covered by this Agreement are warranted against defects in workmanship and materials for a period of fifteen (15) months from the date of shipment, provided the Product remains unmodified and is operated under normal and proper conditions; and (iii) The wearable scanning system Products covered by this Agreement are warranted against defects in workmanship and materials for a period of fifteen ( 15 ) months from the date of shipment, provided the Product remains unmodified and is operated under normal and proper conditions.

The sole obligation of Symbol for defective Products is limited to repair or replacement (at Symbol's option) of the defective component or subassembly. No charge will be made to Buyer for repair or replacement parts. Buyer shall be responsible for shipping costs to Symbol if it is necessary to return the unit to Symbol under this paragraph.

b.     Delivery of Repaired Products.  Transportation from Symbol to Buyer shall be by a carrier selected and paid for by Symbol. The aforementioned provisions do not extend the original warranty period of any Product which has either been repaired or replaced by Symbol. Symbol shall use its best efforts to repair and ship failed units within forty-eight (48) hours

Confidential – Pursuant to Local Rule 26.2
Intermec IP Corp. v. Matrics, Inc., C.A. No. 04-357-GMS

after receipt. In the event a Product returned to Symbol meets all applicable Product specifications, and no repair or replacement is required by Symbol, the return cost of transportation to Buyer shall be paid for by Buyer.

c.   Warranty Exclusions. The above warranty shall not apply to any Product (i) which has been repaired or altered, except by Symbol or a Symbol authorized in writing technician or repair organization, (ii) which has not been maintained in accordance with any handling or operating instructions supplied by Symbol, or (iii) which has been subjected to physical or electrical stress, misuse, abuse, negligence or accident, in the sole opinion of Symbol.

d.   Limitation of Liability. EXCEPT FOR TITLE AND THE EXPRESS WARRANTIES STATED ABOVE, SYMBOL DISCLAIMS ALL WARRANTIES ON PRODUCTS FURNISHED HEREUNDER INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR USE.

16.   Product Returns

a.   Returns. Buyer may return Product to Symbol upon submission and approval of an Equipment Return Authorization ("ERA"). The only Product that will be accepted for return will be new, unsold, undamaged, and unopened in the original, sealed packaging. Damaged or used Product will not be accepted.

b.   Acceptance. Product delivered within seven business days of the date the ERA is requested will be accepted by Symbol without a restocking charge. Product delivered to Buyer less than three months but greater than seven days prior to requesting an ERA will be subject to a 15% restocking charge. Product delivered to Buyer more than three months prior to requesting an ERA will not be accepted for return by Symbol. Custom product cannot be returned. Buyer remains liable for the original freight charges.

17.   Notices

Any notice required or permitted to be given hereunder shall be in writing and shall be

sent by registered or certified mail, return receipt requested, addressed as follows:

TO BUYER:
Ronald D. Payne
Vice President, Contracts
Intermec Technologies Corporation
6001 36th Avenue West
Everett, WA 98203-1264
Fax: 425-348-2703

With Copy to Law Department at above address.

TO SELLER:
Symbol Technologies, Inc.
Paul Juhasz- Corporate Counsel or
Charles Furedy – VP/GM OEM
One Symbol Plaza
Holtsville, N.Y., 11742-1300

With copy to:
Attention: General Counsel
Attention: Sales Administration - MS A-9
Fax:_____

Either party may change its address or the names or titles of the designated individual from that indicated by sending written notice thirty (30) days in advance of such change to the other in the manner set forth above.

18.   Miscellaneous

a.   Entire Agreement. This Agreement, along with the Exhibits hereto, constitutes the entire Agreement and understanding between the parties as to the subject matter hereof, and supersedes and replaces all prior or contemporaneous agreements, written or oral, as to such subject matter. This Agreement may be changed only in writing stating that it is an amendment or modification to this Agreement, and signed by an authorized representative of each of the parties hereto.

b.   No Agency. This Agreement does not constitute a partnership, joint venture or agency between the parties hereto, nor shall either of the parties hold itself out as such contrary to the terms hereof by advertising or otherwise nor shall either of the parties become bound or become liable because of any representation, action, or omission of the other.

Confidential – Pursuant to Local Rule 26.2
Intermec IP Corp. v. Matrics, Inc., C.A. No. 04-357-GMS

c.  Assignment. Neither party shall assign this Agreement nor any obligations or rights hereunder without the prior written consent of the other party, provided, however, that this Agreement and any obligations or rights hereunder may be assigned to the successor of either party or to any entity which purchases or otherwise gains control of the business of that party to which this Agreement relates. All terms regarding the sale and purchase of the Products will be available to successors, assigns, affiliates, divisions and subsidiaries of Intermec.

d.  No Licenses. No right or license is granted by this Agreement, either expressly or by implication, estoppel, or otherwise, under any Symbol patent, patent application, or patent right including, but not limited to, U.S. Patent Numbers 4,758,717, 4,460,120, and 5,130,520, except for a limited immunity from suit for infringement of the claims of Symbol patents to the extent they cover the OEM Products, for Buyer to make, have made, use, sell, import and export the OEM Products described herein solely in the Territory and solely in the Field of Use. Buyer is advised that Symbol has issued and pending patents both inside and outside of the Territory and that no right or license is granted by this Agreement, either expressly or by implication, estoppel or otherwise, under any Symbol patent. To the extent Buyer Manufacturers any OEM Products not including a Product purchased hereunder, nothing herein shall relieve Buyer of its obligation to pay Symbol royalties under any and all applicable license arrangements for such OEM products

e.  LIMITATION OF LIABILITY.
(i)  TO THE EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES ARISING OUT OF THIS AGREEMENT, WHETHER DUE TO A BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE OR OTHERWISE.
(ii)  EXCEPT AS HEREIN PROVIDED, NEITHER PARTY SHALL, BY REASON OF THE EXPIRATION OR TERMINATION

OF THIS AGREEMENT IN ACCORDANCE WITH THE TERMS HEREOF, BE LIABLE TO THE OTHER FOR COMPENSATION, REIMBURSEMENT OR FOR ANY DAMAGES ON ACCOUNT OF THE LOSS OF PROFITS OR PROSPECTIVE PROFITS ON ANTICIPATED SALES, OR ON COMMISSIONS IN CONNECTION WITH THE BUSINESS OR GOODWILL OF EITHER PARTY OR OTHERWISE, OR FOR DIRECT, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES.

f.  No Conflicts. The Parties represent and warrant that, to the best of their knowledge, signing this Agreement with the other Party will not be in violation of any other contract, agreement, or understanding to which it is a party.

g.  No Waiver. Any delay or omission by either Party to exercise any right or remedy under this Agreement shall not be construed to be a waiver of any such right or remedy or any right hereunder. All of the rights of either Party under this Agreement shall be cumulative and may be exercised separately or concurrently.

h.  Captions. The headings of articles, sections and other subdivisions hereof are inserted only for the purpose of convenient reference and it is recognized that they may not adequately or accurately describe the contents of the paragraphs which they head. Such headings shall not be deemed to govern, limit, modify or in any other manner affect the scope, meaning or intent of the provisions of this Agreement or any part or portion thereof, nor shall they otherwise be given any legal effect.

i.  Applicable Law. This Agreement shall be governed by, performed under and construed in accordance with the substantive law of Delaware without giving effect to the conflict of laws principles thereof.

j.  Choice of Forum. Each Party hereby irrevocably and unconditionally submits for itself and its property in any legal action or proceeding relating to this Agreement or for recognition and enforcement of any judgment in respect thereof,

Confidential – Pursuant to Local Rule 26.2
Intermec IP Corp. v. Matrics, Inc., C.A. No. 04-357-GMS

to the exclusive general and personal jurisdiction of the courts of the State of Delaware, and any appellate court thereof. The parties may, by prior mutual written agreement (other than this Agreement), elect to submit a dispute under this Agreement to arbitration whereby: a dispute shall be adjudicated by arbitration in Chicago, Illinois before a single arbitrator, in accordance with the expedited procedures of the Commercial Arbitration Rules of the American Arbitration Association. The parties shall agree as to the scope of the dispute to be submitted to the Arbitrator. The Arbitrator's decision as to such agreed upon issues shall be conclusive and binding as between the parties, and such decision of the arbitrator shall be final, and may be entered in any court having jurisdiction thereof. In any dispute which arises out of, or is in any way related to, this Agreement, the prevailing party shall be entitled to recover its costs, including reasonable attorneys' fees. This clause shall survive any termination of this Agreement.

k.    Covenants. During the Term of the Agreement each Party shall not sue (or bring a counterclaim against) the other party for any claim of infringement (referring to any provisions of 35 USC 271 or comparable foreign provisions) of any patent, whether now or hereinafter in existence, against or relating to any product except for (i) bar code readers to the extent that they use CCD sensor technology, and (ii) RFID Reader Products and RFID Tags except to the extent that they read bar codes. In the event of a breach of this section, the non-breaching party shall have, without limitation of any other right or remedies it may have, the right to terminate this Purchase Agreement by giving the breaching party at least thirty days (30) written notice (which may be extended upon mutual agreement of the parties) of its intention to terminate; provided, however, that if the parties settle the patent infringement lawsuit that accounted for the breach of this Section during such thirty days (30) period, then this Agreement shall not be terminated on the date specified in such notice.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the date(s) indicated below.



Confidential – Pursuant to Local Rule 26.2<br>Intermec IP Corp. v. Matrics, Inc., C.A. No. 04-357-GMS

Symbol Technologies OEM Agreement
Printed: 08/28/03 10:10 AM

Initialed _____ (Symbol) _____ (Buyer)

Page 11

## EXHIBIT 1 - TERM AND MINIMUM PURCHASE COMMITMENT

Section I.  Term and Minimum Purchase Commitments

The Initial Term shall commence on January 1, 2004 and extend, unless terminated in accordance with the terms of this agreement, until December 31, 2006.  The Initial Term shall be automatically renewed for additional one year terms ("Renewal Terms") unless either party has provided at least six months prior written notice of its intent not to renew this Agreement for the upcoming Renewal Term.

The Initial Minimum Purchase Commitment shall be, for each applicable Time Period, the number of units of Product that may be purchased by Buyer hereunder to generate the following Purchase Commitments.

| Applicable Time Period | Minimum Purchase Commitment * | Price Decrease Threshold** |
|---|---|---|
| Period 1<br>Jan 1, 2004 – Dec 31, 2004 | USD $20,000,000 | USD $20,000,000 |
| Period 2<br>Jan 1, 2005 – Dec 31, 2005 | USD $18,000,000 | USD $21,000,000 |
| Period 3<br>Jan 1, 2006 – Dec 31, 2006 | USD $16,000,000 | USD $21,000,000 |

\* The Minimum Purchase Commitment constitutes the amounts of Products to be purchased by Buyer and invoiced by Symbol during each identified Applicable Time Period and shall be exclusive of all taxes, duties, transportation fees or other fees related to such Products.  To the extent Buyer fails to purchase (ie, place orders for shipment during any Applicable Time Period) sufficient quantity of Products to satisfy the Minimum Purchase Commitment for the applicable period, *the amount of purchases below the Minimum Purchase Commitment*  for each Applicable Time Period ("Shortfall Amount"), if any, liquidated damages in an amount determined in accordance with Section 6(e) shall be paid to Symbol within 30 days of the end of the Applicable Time Period.

\*\* After Buyer has received delivery of Product within the Applicable Time Period having a cumulative invoice price in excess of the applicable Price Decrease Threshold

Then:
→the price for each additional unit of Product delivered after such Price Decrease Threshold has been reached shall be reduced as follows:
- For Products to be integrated into scanning integrated terminal OEM Products, pricing shall be reduced 5%
- For Product to be integrated into hand held bar code readers OEM Products, pricing shall be reduced by 3%

Price reductions earned in any Period shall continue into the next Period and shall be cumulative upon meeting the Price Decrease Threshold for that Period.

Confidential – Pursuant to Local Rule 26.2
Intermec Corp. v. Symbol, Inc. C.A. No. 04-357-GMS

## EXHIBIT 2- OEM PRODUCT SPECIFICATION

The Products to be Supplied hereunder may only be used to manufacture only the following OEM Products:

### 1.Cabled Hand Held Laser Bar Code Readers:

A "Cabled Hand Held Laser Barcode Reader" shall mean a laser scanning bar code reader product (1) which is a finished product ready for use by an end-user customer for reading bar codes (i.e., the product is not a "scan engine" such as the "Engine Products" listed in Schedule 1)
The Cabled Hand Held Laser Barcode Reader shall include the following components

- Electro-optical laser based component to emit and collect reflected laser light
- Electronic circuit and software used to convert analog signal to digital signals.
- Housing
- Trigger
- Cable

A Cabled Hand Held Laser Bacode Reader shall not include a Ring Scanner or a Wearable Scanning System

Examples of Cabled Hand Held Laser Scanners include the INTERMEC 1550 series of products. Bar code reader products which are permanently fixed-mounted are not deemed to be Laser Scanners although portable bar code reader products which are detachably mounted and may be optionally used in a hand-held mode for bar code reading applications shall be deemed as Laser Scanners.

### 2.Cordless Hand Held Laser Barcode Readers:

A "Cordless Hand Held Laser Barcode Scanner" shall mean  Hand Held Laser Barcode Scanner that is self powered and communicates to a host device without a hardwired connection between the scanner and the host device.

A Cordless Hand Held Laser Bacode Reader shall not include a Ring Scanner or a Wearable Scanning System

### 3. Scanning Integrated Terminals:

A "Scanning Integrated Terminal" shall mean integrated one-piece or a modular laser scanning Portable Battery Operated Terminal for reading bar code symbols wherein the laser scanning portion of said one-piece Terminal (or a laser bearing module of said modular Terminal) is not separately sold or provided by Intermec (except as part of a repair, reconditioning or upgrade of a customers Terminal), and cannot be detached from the terminal portion by the user for use as a separately functioning laser scanner or portion of a separately functioning laser scanner.  "Portable Battery Operated Terminal" is a computing device containing memory microprocessor and associated software, a keyboard with full numeric and/or alphanumeric keys, a display capable of at least two lines of multiple character display or two lines of graphical images, operable under battery power, and configured for portable operation with or without radio or other remote wireless communication.

A  Scanning Integrated Terminal  shall not include a Ring Scanner or a Wearable Scanning System

### 4.  Wearable Scanning Systems:

Confidential – Pursuant to Local Rule 26.2
Intermec IP Corp. v. Matrics, Inc., C.A. No. 04-357-GMS

A " Wearable Scanning Systems" shall mean data collection system that includes:
- A scanning device which is designed to be operated when worn on the body of an operator, i.e., on the wrist, finger, head, vest or belt; and
- a power source; and
- a communication means (either cabled or cordless)

Buyer agrees that only Ring Scanner Products, and not Scan Engine Products (see Exhibits 3-5), shall be incorporated by Buyer or its contractor into Wearable Scanning Systems. To the extent that a Wearable Scanning System includes a scan engine, it must be the scan engine incorporated by Symbol into the Ring Scanner Product sold to Buyer under this agreement.

Buyer shall have the right to have made the above referenced OEM Products provided the product is of a design developed by Buyer and for Buyer's purchase exclusively. Have Made Right shall not extend to Symbol's competitors of any Symbol product, including without limitation, Hand Held Products, Inc. a Welch Allyn ,Inc. Affiliate, Metrologic Instruments, Inc., PSC, Inc,, Teklogix, Inc, Psion PLC, Matsushita Electrical Industrial Co., Ltd, Denso Inc.., Casio Inc. and Opticon, Inc.

Confidential – Pursuant to Local Rule 26.2
Intermec IP Corp. v. Matrics, Inc. C.A. No. 04-357-GMS

## EXHIBIT 3
### PRODUCTS AND PRICE SCHEDULE FOR INTEGRATED SCANNING TERMINALS AND CORDLESS/RF HAND HELD BARCODE READERS AS DEFINED IN EXHIBIT 2

| Product | Implied Use Price Integrated Scanning Terminal/Cordless/RF Scanner |
|---|---|
| SE-4400-I000A (undecoded 2D imager engine) | $200.00 |
| SE-1200-I002A | $ $130.00 |
| SE-900-I000A | $ $135.00 |
| SE-923-I000A | $ $165.00 |
| SE-1200ALR-I000A | $ $170.00 |
| SE-1200LR-I001A | $ $135.00 |
| SE-1200WA-I000A | $ $130.00 |
| SE-1223-I001A | $ N/A |
| SE-900HS-I000A | $ $190.00 |
| SE-1200VHD-I000A | $ $135.00 |
| SE-1200HP-J100A | $ $130.00 |
| SE-1223LR-I002A | $ $165.00 |
| SE-1223HP-I101A | $ $160.00 |
| SE-1223ALR-I001A | $ $200.00 |
| SE-2223-I001A | $ $300.00 |

1. Pricing subject to the minimum purchase requirements of Exhibit 1.

2. In the event Buyer is presented with a large order opportunity, Symbol shall, at Buyer's request, undertake a review of a price exception for the supply of one of the above referenced engines that may be needed to obtain such opportunity.

Confidential – Pursuant to Local Rule 26.2
Intermec/JP Corp. v. Matrics, Inc. C.A. No. 04-357 GMS

**Exhibit 3 (Continued)**

## SPARE PARTS PRICING FOR OEM PRODUCTS

| Product | SPARE PARTS PRICING* |
|---|---|
| SE-1200-I002A | $ $90.00 |
| SE-900-I000A | $ $95.00 |
| SE-923-I000A | $ $125.00 |
| SE-1200ALR-I000A | $ $130.00 |
| SE-1200LR-I001A | $ $95.00 |
| SE-1200WA-I000A | $ $90.00 |
| SE-1223-J001A | $ N/A |
| SE-900HS-I000A | $ $150.00 |
| SE-1200VHD-I000A | $ $95.00 |
| SE-1200HP-I100A | $ $90.00 |
| SE-1223LR-I002A | $ $125.00 |
| SE-1223HP-I101A | $ $120.00 |
| SE-1223ALR-I001A | $ $160.00 |
| SE-2223-I001A | $ $260.00 |
| SE-4400-I000A (Undecoded - 2D Imager engine) | $200.00 |

\* The Products listed above shall be used solely to service Buyer's OEM products by replacing the same Product which is removed from an existing and previously licensed OEM Product. The above referenced Products may not be used for any other purpose whatsoever, and the sale of such Product shall not be construed as a right, whether implied or express, to refurbish, upgrade or otherwise reconstruct an OEM Product. No right or license is granted by the sale of these Products, expressly, by implication, estoppel or otherwise, under any Symbol intellectual property rights.

Confidential – Pursuant to Local Rule 26.2
Internec IP Corp. v. Matrix, Inc., C.A. No. 04-357-GMS

## EXHIBIT 4
## PRODUCTS AND PRICE SCHEDULE FOR CABLED HAND HELD BARCODE LASER SCANNERS AS DEFINED IN EXHIBIT 2

| Product | Implied Use Price Hand Held Barcode Laser Scanners |
|---|---|
| SE-4400-1000A (undecoded 2D imager engine) | $200.00 |
| SE-1200-I002A | $102.00 |
| SE-1200ALR-1000A | $139.00 |
| SE-1200LR-I001A | $107.00 |
| SE-1200WA-1000A | $99.00 |
| SE-1200VHD-I000A | $107.00 |
| SE-1200HP-I100A | $102.00 |
| LS-32ER-I302A | $219.00 |
| SE-900HS-1000A | $154.00 |

1. Pricing subject to the minimum purchase requirements of Exhibit 1.

2. In the event Buyer is presented with a large order opportunity, Symbol shall, at Buyer's request, undertake a review of a price exception for the supply of one of the above referenced engines that may be needed to obtain such opportunity.

Confidential – Pursuant to Local Rule 26.2
Internec IP Corp. v. Metrist, Inc., C.A. No. 04-357-GMS